And now we have the case of Chambers Vs. School District. The case of Chambers Vs. School District of Philadelphia. Good morning. May it please the Court. My name is Michael Torsha from the law firm of Seminoff, Ormsby, Greenberg, and Torsha in Huntington Valley. Although we did not represent the appellants before this appeal, it's our pleasure to represent Ronald Chambers and Leslie Chambers. Mr. Chambers is in the courtroom today in the back. As parents and guardians of their daughter, Farron Chambers, who is incapacitated, currently 26 years old, formerly a student of the Philadelphia School District. We thank the panel for granting oral argument today and hearing the matter. And I'd like to reserve three minutes of rebuttal time of my 15 minutes. Thank you. We're aware that the panel is familiar with the case. This is the second time this case has been up here on appeal in the Third Circuit. The previous panel was Judges Berry, Fisher, and Jordan, I believe. And I'd like to just highlight three issues today for the Court's consideration. As you know, there are many issues in the briefs, and the procedural posture of this case is a little bit unusual. But the three things I'd like to point out today and highlight first is a waiver argument. That's in the beginning of our brief. It's the law of the case argument and the final judgment rule. And primarily we're arguing that we shouldn't be here in the first place, that the school district should have raised, could have raised, and should have raised the arguments that it made in the district court on its second motion for summary judgment on the first appeal. And that the issue of compensatory damages, whether or not compensatory damage is under the Rehabilitation Act and the American Disabilities Act, was not raised in the first appeal. That's the first general point. Second general point is the applicable standard for a violation of the Rehabilitation Act and the ADA. We, of course, say that it is not intentional discrimination. It is not the highest standard. It is something less than that, which is deliberate indifference, no greater than deliberate indifference. And I think that there is maybe a misconception or a mischaracterization of this issue in the briefs. The briefs make it appear as if this panel needs to decide intentional discrimination or deliberate indifference. And when you read the cases, those concepts are not mutually exclusive. And the third point is, if the panel gets to it procedurally and analytically, is whether or not the trial court erred in considering evidence that it had in front of it for summary judgment and whether it should have considered evidence that was supplemented after the motion for summary judgment. Let's assume that the exclusion of the supplement is a matter of discretion that was not abusive. And we haven't decided that, but there is an abusive discretion standard there. Yes. Give us your take on exactly how the evidence that was presented to the district court creates a genuine issue. And let's use your proposal that it is deliberate indifference, which would require knowledge of failure, knowledge of their violation of the law, and failure to act. Yes, Your Honor. The deliberate indifference standard is important, and we think that the standard articulated is exactly our case. And I know you're asking about the evidence. So the deliberate indifference standard says, the vast majority of the circuits have said, that intentional discrimination can be inferred by the deliberate indifference. Essentially, in this case, if the school district knew that pursuit of its policies would likely result in a violation of federally protected rights. That's the quote that we see from many, many cases that we cite in our brief around page 29. So we believe very strongly that that is exactly what we have. We have a history, a pattern and practice of the school district over many, many years, 15 plus years, that demonstrate that they knew, should have known, that the policies that they were pursuing would result, would likely result in a violation of Farron Chamber's federally protected rights. And that is, in fact, what happened. So the evidence that we have, if you... Well, it's more than knowledge, in that it's failure to act. It's failure to act. Notwithstanding that knowledge. Right. Now the school district says that, essentially the school district says that the more we argue about what didn't happen, the stronger it is for their case. They say, look at all the things that we did for Farron Chambers. This was not intentional. There was no animus here. Maybe it's negligence. In fact, if you look at their brief, they all but admit negligence. They at least admit that there is a genuine issue of material fact as to negligence. As a matter of fact, as I'm sure you read, the first panel found, as they held, that there is a genuine issue of material fact as to whether the school district did not provide a free, appropriate public education for Farron. That's already been established. Let me interrupt you for a second, okay? Yes. I'm going to allow you to engage in fantasy for a moment. You get to be the judge writing the opinion, right? Writing this opinion here today? Yeah. Oh, great. That's fantasy at its highest level, right? Now, I think Judge Rendell's question was very specific, so I'm going to try to zone you in on it even more. Sure. Okay? What's your best case as to what the district consistently failed on? I mean, there are three things you're looking for, right? You're looking for OTPT speech, right? Am I missing something, right? Yeah. And that's essentially the services, right? Yes. Yes. Okay, good. So over the period of time that Farron was supposed to be provided these services, right, your claim is, at various points, it wasn't provided because, you know, they said, you know, they couldn't find a provider. It wasn't provided because the providers stopped providing because they weren't paying. Correct. Right? Right. Okay. I read this stuff. So my key is, just give us a little snippet, a minute or two, your best case for that. When did they know, specifically, and what was the failure? Can I add one added layer to the question? We really want to know. And we also want to know the extent to which the failures were intended to be addressed by the award of the, that's apparently not the subject of the appeal, of the creation of the trust and the deposit of the funds into the trust in order to cover compensatory services up to a certain period. Okay. I'll try to do all of that. I think that's a little bit of a separate issue. That's issue number two. Yeah, it may be. But it's the record question. So first let me point to where you can find this, and then I'll answer the question. In our main brief at 55, there is a listing of 12 categories that highlight the school district's failure. So that's where it starts. And I'm sorry, Judge Rendell, did you say assume, your question, assume that the court did not consider the supplement? Correct. Okay, the supplemental material. All right. So there are expert reports in the record. Dr. Hall had an expert report. That's in the joint appendix at 586. And there's Dr. Lockhart's expert report. There is the ____. Okay, but what do they say? Okay, in 1994, this happened. Yeah, they say ____ goes on in school districts. School district does nothing. Right. That's very close to what they say. They say that as far back as the early 90s, there were IEPs for fair and chambers that were allegedly specific and allegedly appropriate, and there was a finding again and again and again by all of the experts, by all of the hearing, the administrative hearings, that the school district either had inappropriate IEPs or they had IEPs that they simply did not follow. They simply did not provide the services. That's really the main point, isn't it? That it's the speech and occupational therapy that was to be provided that you contend, and they were ordered to provide and people said they hadn't provided, and therefore what did they do? They tried. They couldn't find people. Well, it goes beyond that. And when I hear that phrase, you know, they tried, that sounds like what the school district is saying. You know, we tried but we just didn't do it, and that might be negligence and that might be a failure, but that's not deliberate indifference. But it goes beyond that. They were the consistent failure and the consistent findings of the experts over 15 years told the school district time and time again she's not in the right school, she doesn't have the proper teachers, there's no faculty that can address her needs, she's not in a classroom with other students of the same level, they're higher functioning, she should be somewhere else. Time and time again there were IEPs that were not followed, failed to be followed, and they really had no action. Were there places that would be appropriate and were there things that you could find? I mean, on the one hand, you're presuming there is a level of educability. Yes. And on the other hand, you don't know whether at some point there isn't. Now, I know DuPont advocated a certain box methodology or whatever. Correct. What are you saying should have been done that wasn't done in terms of the kind of drilling down to this therapy and when? Right. In as early as the early 90s, I believe, 93, 94, the experts all made recommendations to the school district. They all said, you're not providing the proper faculty. So that's one issue. They didn't provide faculty that were qualified to handle someone with Farron's disability. All right. What experts were in 93, 94? I really thought most of the expert reports were in the late 90s or 2001. The early expert was – I'm sorry. I have to look at that in our materials. All right, because that's another issue we have. I think the material – it's tough. Some references in the briefs don't jive. In terms of the – In terms of the citation to a specific place that allegedly says X, and you go to the place and it's the cover of the deposition or whatever. So we have some problems there. Okay, early 90s, who you said the experts said? I know there was a finding as a result of due process hearing, and then there was a state bureau, but I don't think these are what you would say are experts. And maybe this is something we ask for supplemental submission on, the specifics. If I can't find it very quickly, Your Honor, the actual – Yeah, I think we probably will ask for supplemental – I'll defer. Specific supplemental references. Okay. And when there is this problem of getting an agreement reached and an order subsequently issued, which happened at different times. Yes. And then there's this failure to – or an inability that the school district is informed about, I gather, to get the services that had been ordered because of a lack of guarantee of payment. Are those services – these are compensatory services. They're just never provided. Is that correct? That's correct. But at some point there are, or perhaps throughout, there are some kind of speech-related services that are being provided at the school. Is that because there's reference to, in the early 2000s, a later failure of speech and OTPT services to be provided, which suggests that they were earlier provided, and it was a little unclear to me if that meant that there were such services provided for a period, not as compensatory services, but as in-school services. Am I reading that right, or is that – No, that's – Is there somewhere in the record that that could be clarified? That's generally correct. That's right, Your Honor. And, again, we're all assuming – this discussion here is all assuming that you get to it. I mean, obviously we're urging that you don't even get to this analysis because the school district had no right to bring this in the first place because of law of the case and the final judgment rule. You can certainly find that they waive the rights by not doing it, and there's really no answer to that from the school district. Your entire law of the case argument is based on that one reference to the earlier panel's opinion? Well, yes. The law of the case – there's two parts to the law of the case, and really there's an additional site that is not in the brief for the final judgment rule, but they work hand-in-hand. The law of the case is that the panel has said – obviously the whole underlying matter in the district court is – It's fine. If that's it, I got it. The law of the case. If there's something more to it, tell me. The panel finding a genuine issue of material fact is the law of the case. Now, we're here today ostensibly because there's a genuine issue of material fact, whether there's an intent, the requisite level of intent on the school district, and we say that should have been brought earlier. And that's the final judgment rule, which we don't have this in the brief, but Robinson v. Johnson is a third-circuit case from 2002. Is there a challenge to compensatory damages under the ADA and the RA in the initial complaint? No, there is, but there was no challenge to that. There was a challenge of compensatory damages generally in Chambers 1, but the school district never raised this intent element, this intent. They never said that you can't have – you can't prevail on compensatory damages because you haven't had the requisite intent. So they didn't move for summary judgment on it earlier? They have not. And by the way, nothing has changed. There's been no amended complaint. There's been no new claims. There's no reason why they couldn't have done it.  By the way, the district court affirmed all of the dismissal of all of the claims except for the Rehabilitation Act, except for the ADA. They said specifically there's a genuine issue of material fact. In fact, the court even said – they used the words not to mention. You know, the panel said there's a genuine issue, quote, not to mention whether the school district otherwise committed violations of the Rehabilitation Act and ADA.  It should have gone to a jury. But then they filed a second summary judgment motion and said, well, you can't really prove the intent. And that's what the final judgment rule would bar, would say. The inefficiency of us even being here is exactly what the final judgment rule would bar. Well, let me ask you this question. Putting the issue that you've just been discussing aside for a moment, is it your position that at no time when Farron was at Wordsworth, did she receive a FAPE? I'm sorry, did she receive what? FAPE. Oh, yes, FAPE, yes. Correctly, right? FAPE. Sure. So I'll repeat it. I'm sorry. Is it your position that while Farron was at Wordsworth, she never received the FAPE? Correct. Okay. Now, she was there for some time. Well, yes, she was. She was. And the school district was quick to say, well, Mr. Chambers signed off on forms and everything else. Sure he did. But you admit that for a period they were largely satisfied with Wordsworth for their daughter. Well, for a period. I had a problem squaring that. That's a different question than the one that I asked. Okay. We'd like the answer to both. I'll answer both. Because they seem a little off. The answer to Judge Greenaway's question is, yes, I agree with what you said, that at all times she did not receive an FAPE of FAPE while at Wordsworth. The answer to Judge Rosenthal is there was not a period where they were satisfied, but the reality is it takes a while to know whether something is being implemented properly, to see progress, to get reports. And as you see from the record, it was a constant battle to get reports. And then pretty much every report that was written said this is not being properly done. So it wasn't that they were satisfied. It just took a while to object. It seemed to me some of the satisfaction was more behavioral than anything. She seemed more relaxed or something. I don't know. It seemed more an outward affect of hers. Right. And the record reflects. Let's be frank about it. It's not that 100% of every minute was horrifying at all these schools. There were times that were better than others. She had some educators that seemed to do a better job, but never appropriate to her disability. And that's really the bottom line. Every expert has said she's a 26-year-old. She communicates at the level of a 2-year-old right now. But I think our law, I would worry about us relying on the inability or the lack of progress as the only measure of the lack of services because there's obviously a causal connection that we are not in a position to evaluate. Correct. That would not be the only factor. And again, I say what should have been done? Is there a school? What therapies? What would have been the kind of aha moment? Well, of course, anybody looking at this situation has to go to this place or provide this therapy or it was known at the time. I mean, an awful lot of stuff having to do with autism was not known in the 90s. Or 20 years ago. Yeah, exactly. What are you saying they had to do? Yeah, but they didn't provide educators who were even satisfactory with what was known at the time. The experts in the reports have said she didn't even have someone who was familiar with autism at the time. If I could add two other questions to push on that a little bit. To what extent is your criticism of the school district's response to the IEPs that were in place and the continuing questions that were raised, to what extent is your complaint one of placement, that is the schools in which she was placed, as opposed to the specific failures to provide speech and OTPT to her, number one? And number two, what are we to make of the school district's arguments that at various times, not that the parents were at fault because that's not a legal analysis that applies here, but that some of the school district's explanations for delays or difficulties in implementing the IEPs arose out of disagreements about evaluators that could provide the necessary information that the school district's processes required or that the administrative process required? They're separate questions, but I'd like you to address them both. Well, to the first question is that the place where she was, the various schools that she attended versus the services that she was given are related. Those two are very related because there are schools that obviously are better geared towards the services, so really those things go hand in hand. The record seems to reflect that it was hard for the school district to figure out a place. Is that a fair reading of the record? I think that's a fair reading of the record. They would certainly say that they had a hard time figuring out a place, and that may have been true. But we know that wherever she was that the IEPs were, when I say nonexistent, I don't mean literally nonexistent, but ignored, ineffective, et cetera. So the place and the services really go hand in hand. But if I had to choose one, I'm not sure you're asking me to, but if I had to choose one, I would say probably the services were more deficient. About the parents' delay, and I don't want to be too dramatic about this, but that's an offensive notion. It really is. It's not so much delay, and I don't think the school district to its credit says, and I apologize for interrupting, says that the parents were to blame. That's obviously not only offensive, the parents are not responsible for the school district's doing its job in this area. And if this was a situation, and I'm not sure how to express this, but if this was a situation where you had difficult parents generally, and you couldn't satisfy them, and nothing ever made them happy, and they were the ones who were constantly pulling the child out of the school, you might say, look, what is the school district supposed to do? This is not that situation, because virtually every time that the chambers pulled Farron out of the school or objected to the services, or objected to the educators, or they filed for, as you know, administrative hearings and reports, every single time they were supported by the findings of these hearings. And these are not people that the chambers hired. These are objective hearing officers and objective experts. So they were vindicated, if you will, by their objection and the things that they did. Thank you. We'll hear from you. Good morning. Good morning. Jeffrey Scott for the School District of Philadelphia. Normally I would not go back into the procedural history of the case, but I think it's a long history, and I think since it was raised, it would be a good start for a starting point. When the case was filed originally back in 2005, it was a 1983 case. It was a case and also had statutory claims under the ADA and the Rehabilitation Act. Discovery was conducted vigorously by the plaintiffs, and summary judgment was filed. During what had appeared from the briefs and during oral argument, the plaintiffs' counsel was arguing at one point that his section, his claims under the statutory claims under the ADA and the RA, were really a vehicle to get to the 1983. So the district court had questioned the plaintiff on that, and the judge believed that he basically was not bringing those claims, but it was all about 1983, whether it was a Monell claim. It was a direct Monell claim. There was no individual defendants in the case. So when the judge issued her first opinion, district court judge issued her first opinion, she believed that Mr. Chambers was not bringing the ADA and the RA claims. However, the school district did brief those issues, and the school district did argue that there wasn't enough evidence to go on the ADA claims. So there's no waiver in your bond? There's no waiver. Meanwhile, while the case was going up on appeal and coming back, the case law in the area started to change a little bit in terms of the RA and the ADA, I'll call it, the 504 and the ADA. And we had some district court judges in our district start to get cases such as this where there was allegations of discrimination and claims for money damages, not injunctive relief, but claims for money damages. And that's what sort of changed. We have Judge Sarek's opinion in the Caitlin C. case, which talks about because these claims are under Title VI, these are spending clause type cases, you need to have proof of intentional discrimination. So the law started to get more. Yeah, okay, we got the rubric that it's intentional discrimination. I suppose if you're going to go down that road, the initial question is discriminatory animus or deliberate indifference. So what's the argument against deliberate indifference? Because the majority of the circuits that have looked at it have invoked deliberate indifference, the argument being that looking at the legislative history and the purposes of the two critical statutes that you've alluded to, that a standard of deliberate indifference is more in line than discriminatory animus. Okay, let me address that directly. It's the school disposition position that deliberate indifference is too low of a standard in these types of cases. And here's why. Deliberate indifference, that was borrowed from the 1983 case law. And deliberate indifference is much different than what the Supreme Court was talking about in those Title VI cases, the ADA case. They were talking about direct, purposeful discrimination. You have to have a decision maker making a decision because of the disability, not in spite of. When would you be able to prove that a school district person did this because your kid is autistic or because your kid is and lists the litany of things that your child could be? There was a case that actually was filed where it was alleged, and it's in our brief, where a school district person actually had a policy of not providing services to a particular child because that child had Tourette's syndrome. So that was just one instance. I agree with Your Honor that most discrimination cases, you don't have the smoking guide, you don't have the memo, you don't have a memo that says that. But when we get into deliberate indifference, what we get into is a lot of disagreement about how the program was presented, in other words, the IEP. We get in disagreements about what would the outcomes be. We get into disagreements, what could have been better. Well, let me ask you this question. That's what we just courts, we have a standard of deliberate indifference. And you drill down and you look at what happened. And only if there was indifference that was deliberate, it's not a low standard. It's not. It's not a low standard. And yet when you see it, when it happens, why should it not, why should there not be damages for someone who has deliberately. If the court is going to do that, the court has to be specific. For example, we know in cases involving, I'll go outside a little bit out of this realm, where we have different standards for shocking the conscious, right? In some cases it's intent to harm. In some cases it is deliberate indifference. So we do know that there are different levels of intent. If the court is going to adopt a deliberate indifference standard, it's got to make sure, and this is our position, that it just can't be, it could have been better even if they knew. Things could have turned out better even if they knew. I mean, as a matter of law, we have standards that that's not it. It is knowing there's a failure and knowing, knowing, knowing there's a failure and not acting. You would agree with this proposition, and tell me if you don't. If there is an IEP in year one, and that IEP, which is a product of an agreement between the parents, depending on the age of the child, the child, and the school district, it sets out, pick a number, five things that need to be met, right? You would agree that if none of the five things were met, that would certainly meet deliberate indifference. It depends if we had a little bit more facts. In other words, if none of those... Okay, let's fill in the facts. Okay. Let's say that the first three matters were provide speech, provide OT, provide PT. Okay? In fact, let's change the hypothetical. There are only three things in the IEP.  And it says, you know, speech will be provided three times a week, both in school and out of school. PT, three times a week. OT, three times a week. We'll make it easy, right? All three times a week, right? OT, in my hypothetical, is not provided at all. PT is provided once a week rather than three times a week. Speech is provided once a week and not three times a week. Okay? In that hypothetical, right, three things on the IEP, none of which are provided as is set forth in the IEP. Is deliberate indifference met? If there was an intent not to provide the services because of the disability, I would say yes. No, no, no. No. Let's add to it that someone says to the school district, you know, she's not getting these. Send them a letter. Send them a letter. No question that they know. She's not getting a due process hearing. She's not getting. And it's not done. Then what? Is that deliberate indifference? It could give rise to deliberate indifference. Then we need to get to the next step. And the next question is. You're saying deliberate indifference on a, specifically indifferent to the disability. Because it's a discrimination statute. I guess I'm getting stuck on the fact that it's a discrimination statute. It's because of her disability. Well. That's the issue. But the statute is designed to deal only with disabled people. It's not like we're dealing with a normal discrimination population that you've got the whole world and because this person's African American and because this person's a woman, as compared to the whole population, that's all there are is disabled people. We're talking about the IDEA. And the IDEA is both. I'm sorry. The ADA. The IDEA coupled in with the ADA and the 504. So the questions that you're asking are in the IDEA context. If you then move it into the ADA slash 504 area and the person is eligible and the services were not provided because of that particular disability, then I think, Your Honor, then that would give rise to a claim. No. No. Maybe I'm. Yeah. Well, so we have, what is it, a failure to communicate. We might. At the moment. But we're going to get over that in a second. Here's the issue, right? Our point to you is IEPs are negotiated. I mean, there's give and take. In fact, I would call it. It's never perfect, right? Yes. But at the end of the day, everybody signs off on the IEP. It's almost as though it's a contract. Yes. Okay. You got it. All right. Beautiful. So in my hypothetical, when none of the three things that have been agreed to in the contract have been provided, right, is there an action for breach? And let's assume now that breach equals deliberate indifference. And there's knowledge and a continued failure to act. Continued failure to act. And it's because of the disability, I would say. I'm not in that. Because of disability. We've got a contract. You just said we have a contract. Well, I have a contract because both parties sign it and there's an agreement that the parents will do something. Exactly. But because of disability, you're getting back into somebody's head that we said you don't have to do. So not we said, but the courts generally have said. So imagine. I respectfully disagree on that. We've got deliberate indifference here, not a lower standard at all. And then in the middle we have intentional discrimination. And some courts have described deliberate indifference as a way to show intentional discrimination. And then we have at the far point, at the bookend, we have discriminatory animus. Yes. And you're taking the position, if I understand you correctly, that you have to have discriminatory animus as the basis for not delivering the services, even though, as Judge Rendell points out, the only people who are getting the services are disabled and the discriminatory animus is because of disability. Yes. There's a circularity there. If there was a claim for injunctive relief only, you don't need intent. We know that under the ADA and the 504. No, we're talking about damages. We're talking about damages here. And the Supreme Court has never addressed this issue. When the Supreme Court has addressed the issue under 504, they always talk about the proof of discriminatory intent. And, yes, one way of proving that could be deliberate indifference. Deliberate indifference. It depends, though, how the court defines it. And that's all I'm saying. It is a way. Let's say we're defining it as knowledge, and not just a little blip knowledge, but brought to your attention knowledge and failure to act. Tell me how that – your brief agrees that in 1995, as a result of the due process hearing, there was an order that says you're not giving the services. 1999, the Pennsylvania Bureau concluded she wasn't getting the services. She was the lowest functioning student in Wordsworth in 01, and she's been in Wordsworth for at least six years. What did the school district – how did the school district respond to those instances and provide the services? What's in the record about the school district having indeed – and add to it the fact that they were supposed to – that the chambers were allowed to get services and have them paid for by the school district, and the school district did not come forth and say we will guarantee. How – okay, forget the last one. You seem confused. How did – No, because I wasn't sure whether or not – Okay, how did the school district in those three instances of somebody's being told to do something or somebody should have known to do something, what gets done to provide those services? There was additional occupational therapy provided. It's in our summary judgment package, which is part of the appendix. There's a litany of things that a school district did in terms of they were required to do OT, they were required to do PT. They actually exceeded those hours at the school. There was additional compensatory – Well, you can't respond to the question like that. I mean, please give us some specificity, right? I mean, the judges come to you with particular years or – I mean, there was extra OT and PT is not helpful to us. Well, and the fact that 95 they were ordered and then 99 said it wasn't given, and then we find out the placement in Wordsworth. I can – in 1995 and 1996, Vern received 111 hours and a quarter during the school year for 95-96. What was provided for in the IEP? It was actually – the parties in 1997 entered into a settlement agreement. Right, a settlement agreement. Right, and the agreement provided compensatory education in the amount of 54 additional one-on-one speech therapy sessions for Vern, and the parties agreed that additional therapy could take place at the discretion of the chambers during the summers after normal school hours at the conclusion of the school year in which Vern turns 21. So that was part of the agreement. So there was compensatory education awarded. Well, you say it was awarded. Who was supposed to go out and provide that? The chambers during the summers could get the services that they were awarded. I don't know, without asking the court if I could write a letter, know for sure because the record that I have isn't clear whether or not – in fact, it indicates to me that those services were not. Was that the instance where Mr. Chambers said, I need somebody to guarantee payment in order for me to make sure that, you know, I can procure these services and couldn't get anybody to do it? Is that at that juncture? I don't believe that that's the case, but I can double-check, Your Honor. Can I please just go back about 30 seconds in time? Yes. Did you just say that as a result of the 1997 agreement, there were 54 one-on-one sessions to be provided, and as you stand here now you don't know whether they were provided? I do know that actually at this point, I would have to follow that up with a letter to the court. Now, you know, we have an issue here. It's an issue of fact. Is there a genuine issue of material fact? This was summary judgment. You know, you don't know, and therefore, we don't know for sure that these things were done. And if they weren't done after the school districts told, do them, due process hearing, Pennsylvania Bureau, Wordsworth, then at least shouldn't this go to a jury? Well, the first go-around, we had Chambers 1, we'll call it. All these same issues were briefed in the district court, and all these same issues were in front of the Court of Appeals. The Court of Appeals, and I'm going to get, Your Honor, I'll get to the very question. The Court of Appeals determined that based on the record as it existed, at the time, that there was no evidence of deliberate indifference, no evidence of deliberate indifference, deference to educational needs on the Section 1983 claim. They also found that there was no evidence of discrimination under the Equal Protection claim because there was no evidence of purposeful discrimination or evidence of intent based upon the records gathered by the plaintiffs. So, it's our position that the plaintiff had the burden of proof the first time around on the issue of deliberate indifference. They did not make out deliberate indifference the first time. The evidence that they presented the second time, when the case came back on remand, was identical to the first, with the whole record. They submitted to the court the same evidence, and we had already argued in our brief that... I'm going to beg your pardon and interrupt. The reason I'm going to interrupt is, you're not getting to, I think, what the judge asked you and what Judge Rosenthal and I share an interest in, and that is, if there are no genuine disputes as to material fact, then you have no problems, go home, you win. We get that. But in response to my question a few moments ago, there's a critical... I'm not sure there's anything more critical than the response to what happened as a result of the 1997 agreement. There are many agreements, there are many IEPs, but one of the principal ones is the 1997. And if, as you stand here now, you don't know whether a particular service provided for in an agreement was provided for and was actually given to the chambers, then how can we possibly affirm a grant of summary judgment? Your ability to supplement the record now, I can't speak for my colleagues, but doesn't seem particularly useful, because if you can't answer this to us now, it leads us to a conclusion that there have got to be genuine disputes that should be resolved in the district court. Why am I wrong? Because the district court judge was correct when the plaintiff did not come forward with sufficient facts to show the conduct necessary for compensatory damages under the ADA. It was the plaintiff's burden of proof on summary judgment to come forward. And she kind of adopted the standard that you were arguing to us, at least in her opinion. Did she not, on account of? In other words, deliberate indifference on account of? She did. And my position is she found that Ridgewood case, which said less than intentional conduct in another context, was not applicable. But Judge Prater did adopt an intense standard, and she said under whether it's purposeful or deliberate indifference under the facts of the record presented by the plaintiffs on summary judgment, there wasn't sufficient evidence to show intent. She also cited in her opinion this Court's decision on the due process claim, which is a deliberate indifference standard. It's the same evidence. And she also cited to the equal protection part of this claim, which has to do with intent as well. So the plaintiff on both occasions, at least in the district court, the first time did not have evidence of deliberate indifference against the school district. You appear to be conflating deliberate indifference and discriminatory animus. Well, if the Court's going to adopt deliberate indifference and borrow from the due process standard, which is what I'm hearing, in other words, deliberate indifference in a due process context. Substantive due process is very different. It shocks the conscience. It's a different thing. So to say to us that we're foreclosed because the first time around we said there was no deliberate indifference, it's apples and oranges. And that was substantive due process, procedural due process, equal protection, and a failure to show that she was treated differently from similarly situated other people. This is a disability statute. What we have with the RA and the ADA are specific disability statutes. They're not just general due process. Understood, but the same type of, I would call judge, in the Simmons case they used scienter-like knowledge, and that's the kind of information that you were asking me, was there scienter-like knowledge, and did you ignore a known risk for a constitutional right? That's the same type of intent I think you would need under an ADA and a 504. You'd have to have direct knowledge and a failure. I don't want to say a failure to act, but a reason not to act. It's deliberate indifference. It almost sounds the same in terms of how could you differentiate between deliberate indifference on a due process versus a statutory claim. I'd struggle with that. We do that. I struggle with that. I struggle with that. I'm not trying to do anything other than deliberate indifference and deliberate indifference in this context under the same set of facts, under the same evidence, seems to me to be the same, almost the same standard but under a different set of laws, which is in this case the RA and the Section 202 of the ADA. So if the school district didn't have the deliberate indifference under the due process, they couldn't have the deliberate indifference under the ADA or 504. If I could just wrap up. I don't know if the Court's interested, and if not, you'll let me know on the collateral estoppel issue. I think the issue of denial of faith is really not necessary in this case because I think the Third Circuit originally had ruled that there's a genuine issue of material fact. I think because we presented the case and we presented the hearing officer's opinion that it is an issue of material fact, but the mere fact that faith was denied, Your Honor, doesn't mean that there's an automatic violation of Section 504 and the ADA. That's a very important concept because you could have a denial of faith, as what you were describing, Judge Greenaway, failure to implement an IEP, but that automatically doesn't give rise to a claim under the ADA and Section 504. So they're not one and the same. So maybe that's a better answer to your question, and I suggest that before it does adopt the deliberate indifference, mere disagreements over services and even services that were provided, we still have to get to the crux of the statute, and it's because of disability. And I don't think the plaintiff met the burden of proof. I think the Third Circuit said that the first time around, and respectfully, I think Judge Prater said that the first time, the second time, and I'm going to ask the Court for the third time. Okay. Thank you very much. A rebuttal? Yes. Mr. Torshaw? Thank you for the extra time afforded. I'll be brief and just address a couple of quick things here. First of all, I just heard the entire conversation, of course, and I would, of course, disagree with what School District Counsel just said ten seconds ago, that the intentional discrimination, no matter what, means it has to be an act because someone's disabled. That's the whole point here, is that it doesn't have to be an act as a result of someone being disabled. It only has to meet that other standard we were talking about, which is indifference to the likelihood of the policies being continued and resulting in a violation of federally protected rights. There's a couple of places I did have an opportunity to quickly look. You asked about the early 90s, you know, where it can point to for the early 90s. And the joint appendix at 597, it's the report by Richard Hall. He reviews the history and the treatment of Farron. It starts at 586, but at 597 there's a chart, and at 599 there's a chart comparing the cognitive processes of Farron, what it was and what it could have been. I'm aware of the issue that just because there was a lack of development, that's not necessarily, but he does review what happened through that time frame. The hearing report of March 18th, 2004, similarly goes through the history from 1992 into the mid-90s. That starts at joint appendix 750, and I believe the more pertinent part is joint appendix at 754. I forget who asked the question about the incident with Mr. Chambers, the pain of the $250 where the school district didn't pay. That was for an on-site consultation that was supposed to happen and the school district failed to pay. That's at the joint appendix at 583, and it's contained 583, and that's contained in a letter by Richard Leighton, who was retained to, again, evaluate Farron. The time here today, even though you gave both of us much extra time, the time we didn't get into some of the other procedural issues. I'm very well aware of the trial court's discretion in a lot of the procedural issues. I would just say that I don't think that regardless of the decisions that have been for or against Farron Chambers, I think that every opinion literally that we've seen by the district court in this panel has talked about how sympathetic the case has been. It's a very heart-rending case generally, and as I said in the brief, and I'll just close with this, I mention that because of what the family has gone through, not as a matter of sympathy. We can certainly argue that sympathy might not have a place in these legal arguments, but there's not a very large space between sympathy for the family and what might constitute a manifest injustice if the trial court doesn't review certain information. There's not a very large leap between sympathy and prejudice outweighing for one party or the other. So to the extent that the court analyzes any procedural issues or any substantive issues where there's manifest injustice or excusable neglect or there's a balance of the equities or prejudice, I think it's clear that that would weigh squarely on the side of Farron. So I thank you for your time. All right. Thank you very much. The case is well argued. We'll take it under advisement.